BLAIR C. PEREZ
Attorney for the United States
Acting Under Authority Conferred by 28 U.S.C. § 515
ANDREW G. SCHOPLER, CASB# 236585
MARK W. PLETCHER, Colorado State Bar No. 034615
HELEN H. HONG, CASB# 235635
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, CA 92101
Tel: (619) 546-8068/9714/6990
Email: helen.hong@usdoj.gov

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No.:   14CR0388-MMA |
| v. | Trial Date:   July 26, 2016<br>Time:          8:30 a.m. |
| JOSE SUSUMO AZANO MATSURA (1),<br>    aka Mr. A.,<br>    aka Mr. Lambo,<br>RAVNEET SINGH (2),<br>    aka Ravi Singh,<br>MARCO POLO CORTES (4),<br>EDWARD SUSUMO AZANO HESTER (5),<br>    aka Susu,<br>    aka Junior, | **UNITED STATES'<br>TRIAL MEMORANDUM** |
| Defendants. | |

## I

## STATEMENT OF THE CASE

### A.   THE CHARGES

The grand jury returned a Third Superseding Indictment on July 8, 2016.   The defendants will be arraigned on the Third Superseding Indictment on July 21, 2016.

Count 1 charges defendants Jose Susumo Azano Matsura (Azano), Ravneet Singh (Singh), Marco Polo Cortes (Cortes) and Edward Susumo Azano Hester (Hester) with a conspiracy to make campaign donations by a foreign national, in violation of 2 U.S.C. §§ 441e(a)(1)(A) and 437g(d)(1)(A)[1], and to falsify records, in violation of 18 U.S.C.

---

[1]     Now codified at 52 U.S.C. § 30109(d)(1)(A) and 30121(a)(1)(A)

§ 1519, all in violation of 18 U.S.C. § 371.  As the indictment sets out, the defendants conspired through September 2013, along with Ernesto Encinas, Marc Chase, and others, to funnel hundreds of thousands of Azano's dollars into local San Diego elections.  In return for his cash, Azano sought personal influence, from obtaining letters of recommendation for Hester's college application to a meeting with the mayor to pitch development projects aimed at transforming San Diego into a "Miami of the West."  But as a Mexican citizen—allowed to enter the United States only on a B1/B2 visa—Azano was not permitted to influence the democratic process with his money.  The defendants therefore engineered various means to get it done: from reimbursing conduit donors, to sponsoring a political action committee, to offering online campaign services paid for by Azano's funds, to cutting a $120,000 and two $30,000 checks in Marc Chase's name as political donations (which Azano bankrolled).  Hiding Azano's role was integral to the scheme.  As an object of the conspiracy, the defendants caused the political candidates and campaigns to submit false records to the San Diego City Clerk's Office and the Federal Election Commission, concealing, covering up and hiding Azano's role as the true source of the donations.

Count 3 charges these same defendants with the substantive offense of a foreign national making a campaign donation, in violation of 2 U.S.C. §§ 441e(a)(1)(A) and 437g(d)(1)(A).  The defendants are alleged to be liable for the substantive offense as principals, aiders and abettors, and under *Pinkerton*.

Count 2 charges defendants Azano and Cortes with a conspiracy to make a campaign contribution in the name of another, in violation of 2 U.S.C. §§ 441f and 437g(d)(1)(A).[2]  Azano, Cortes, and others, including Marc Chase, conspired together to make a $30,000 donation to the Democratic Congressional Campaign Committee (DCCC) for the purpose of influencing elections for Federal office.[3]  Marc Chase wrote the check

---

[2]     Now codified at 52 U.S.C. § 30109(d)(1)(A) and 30122.

[3]     The DCCC boasts that it is "the official campaign arm of the Democrats in the House of Representatives," and the "the only political committee in the country whose

and filled out a contribution form identifying himself as the donor.  Cortes delivered the check.  But all of them, including Azano, knew that Azano was the true source of the $30,000.

Count 4 charges Azano and Cortes with a campaign contribution in the name of another, 2 U.S.C. §§ 441f and 437g(d)(1)(A).

Counts 5 through 37 charge one or more defendants with falsification of records in violation of 18 U.S.C. § 1519.  The majority of the counts relate to falsified entries on the "Form 460" submitted by political candidates to the San Diego City Clerk's office.  Because the defendants hid the true source of various donations, the campaigns were caused to submit campaign disclosure forms that concealed, covered up, and falsified the identity of the true donor.

Count 38 charges Singh with bribery, in violation of 18 U.S.C. § 201(b).  As Singh worked with Encinas to further the conspiracy charged in Count 1 of the indictment, he saw Encinas as an opportunity to obtain information about a professional rival.  He asked Encinas if Encinas had any sources for confidential law enforcement information about that rival, and ultimately agreed to pay $1,000 for classified information obtained from law enforcement files.  Singh made payment and obtained a dossier that Singh believed contained classified information.

Count 39 charges Azano with unlawful possession of a firearm, in violation of 18 U.S.C. § 922(b)(5)(B).  Because Azano was admitted to the United States on a non-immigrant visa, he was not allowed to possess a firearm.  But in January 2014, law enforcement seized a firearm from Azano's bedroom closet.  At the time of the seizure, Azano admitted that the gun was his.  Azano subsequently claimed to others that he had received the firearm as a gift from Mexican generals or a Mexican politician.

principal mission is to support Democratic House candidates every step of the way to victory."  See http://dccc.org/about/.

3

**B.    TRIAL STATUS**

A jury trial is scheduled for July 26, 2016, at 8:30 a.m.  The United States expects its case-in-chief to last approximately four weeks.

**C.    STATUS OF COUNSEL**

Defendant Azano is represented by Michael Wynne.    Defendant Singh is represented by Michael Lipman and Karen Alexander.  Defendant Cortes is represented by Nancy Rosenfeld.  Defendant Hester is represented by Donald DeGabrielle.

Defendant ElectionMall, Inc., represented by Frank Vecchione, has been severed for this trial with the agreement of all parties.

**D.    CUSTODY STATUS**

All of the defendants are on bond.

**E.    INTERPRETER**

Some witnesses will require the assistance of a Spanish language interpreter.  The United States has secured the services of a certified Spanish language interpreter.

**F.    JURY WAIVER**

Defendant has not filed a jury waiver.

**G.    PRETRIAL MOTIONS**

The parties engaged in extensive motions practice prior to trial.   Aside from discovery motions, *see, e.g.*, Dkt. 23, 41, 71, 101, 108, 293, the defendants filed motions to dismiss the foreign national campaign donation counts, contending that the statute is unconstitutional, Dkt. 107, 114; motions to dismiss the § 1519 counts for failure to state a claim and on jurisdictional grounds, Dkt. 112, 115; motions to suppress wiretap evidence, Dkt. 110; a motion to dismiss the gun charge under the Second Amendment, Dkt. 111; a motion to suppress Singh's statements, Dkt. 131; a motion to dismiss the bribery count because of alleged outrageous government conduct, *id.*; a motion to suppress any evidence obtained from search warrants that contained any information from the wiretaps, Dkt. 190; a motion to sever defendants, Dkt. 221; and defendant Azano's motions for change of venue, a *James* hearing, and to dismiss the gun count.  The United States opposed, Dkt.

1  142-149, 200, 225, 310.  This court denied all of the defendant's motions, unless the
2  United States did not oppose the motion as moot.

3  **H.   MOTIONS _IN LIMINE_**

4      A hearing on the parties' motions in limine is scheduled for July 21.  The motions
5  and responses are contained at docket entries 317-320, 330-34, and 338.

6  **I.   STIPULATIONS**

7      The parties have not entered any stipulations.

8  **J.   DISCOVERY**

9      The United States has complied and will continue to comply with its discovery
10  obligations.

11                                    **II**

12                        **STATEMENT OF FACTS**

13  **A.   INTRODUCTION**

14      Defendant Jose Susumo Azano Matsura is a wealthy Mexican citizen and foreign
15  national.  He was allowed to enter the United States only on a temporary B1/B2 visa.
16  Despite being married to a United States citizen and having a son who is a United States
17  citizen, Azano has never obtained any status to reside here, and has never been a lawful
18  permanent resident.  As a result, Azano was forbidden from contributing or donating to
19  American elections in any way, whether at the local, state or federal level.

20      That prohibition posed no obstacle for Azano.  In just election cycle, Azano injected
21  approximately $600,000 of his money into local San Diego political campaigns, which
22  represented a significant portion of all the donations obtained by those political
23  candidates.  Azano's motives were simple.  In return for his donations, Azano sought to
24  buy political influence.  For example, he wanted support for his vision of "Miami
25  West"—a San Diego waterfront redevelopment project with a yacht marina, a five-star
26  hotel, and luxury bayside condominiums.  In other instances, he wanted access, like the
27  ability to call on influential political figures, for example, to obtain letters of reference to
28  secure his son's admission to the University of San Diego.

Azano could not act alone.  Instead, he engineered this election fraud through co-conspirators such as Ravneet "Ravi" Singh, Marco Polo Cortes, Ernie Encinas, and his son Edward Susumo "Susu" Azano Hester, to cover up the fact that he was the source of funds.

Ravneet Singh is the CEO of ElectionMall and self-proclaimed "campaign guru." His business was providing campaign-related services.  Azano drew on Singh and Singh's business to provide hundreds of thousands of dollars' worth of off-the-books social media services to two different mayoral campaigns.  For the majority of his fees, however, Singh did not invoice the campaigns.  Instead, he sought promises of payment from Azano and received wire fund transfers from Azano's Mexico-based company for his work.

The conspiracy also drew on the expertise of former City Council candidate and registered lobbyist/fundraiser Marco Polo Cortes.  Cortes provided advice and assistance in furtherance of the election fraud.  To cite one example, Cortes personally delivered illegal checks to political campaigns, knowing that the funds were actually Azano's.

Azano's son Susu helped recruit various "straw donors,"[4] while reimbursing them under the table for their campaign contributions.  Susu stood to gain a leadership position in the company that Azano recruited to spearhead his "Miami West" redevelopment project.

In addition, Azano worked closely with two codefendants who have already pleaded guilty for their role in the conspiracy: Ernesto "Ernie" Encinas and Marc Chase. Encinas, a former SDPD detective and security company owner, headed Azano's security detail, and effectively acted as Azano's personal valet.  Ernie worked at Azano's behest. He provided access to political figures based on his work as a law enforcement officer. Encinas, for his part, also stood to gain personally from Azano's effort to gain political influence. Encinas longed for a new mayor who would find a Police Chief more sympathetic to the nightclubs his security firm serviced.

---

[4]      Also called "campaign money laundering."

Marc Chase owned a luxury car dealership in La Jolla, California. Azano represented the single largest customer of his dealership in 2011 through 2013. Azano purchased 19 luxury automobiles, including a $2.5 million dollar Bugatti, as well as Lamborghinis, Rolls Royces, and Ferraris. Chase forged a strong business relationship with Azano, which led to a multi-million dollar loan, and which developed into a personal friendship. Chase ultimately agreed to recruit "straw donors" and later to serve as a conduit himself for $180,000 worth of Azano's campaign donations.

**B.    THE CAMPAIGN MONEY LAUNDERING SCHEMES**

During the course of the scheme, Azano and his co-conspirators adopted increasingly sophisticated methods to commit campaign finance fraud. Those methods evolved in direct response to arising obstacles and in order to ensure continued success in injecting Azano's money into San Diego politics:

1.    **Individual Straw Donors for Dumanis Primary Campaign for Mayor**

In mid-December 2011, Azano hosted San Diego District Attorney and Republican mayoral candidate Bonnie Dumanis at his Coronado Cays mansion for a "meet and greet." Shortly thereafter, he decided to support her bid for mayor and launched a series of efforts to recruit straw donors who he would reimburse for their contributions.

For example, on December 21, 2011, an Azano employee sent an email to a select group of close friends, setting forth Azano's scheme: "Guys, I need to get a $500 check from you to help Susu [Hester] and His Father [Azano] support the soon to be Mayor Bonnie Dumanis. We will give you the cash right away so you won't lose any money but your support is appreciated and very much needed." Thereafter, that employee and Azano's son Hester ("Susu") drove around providing cash reimbursements to those straw donors, in exchange for their $500 Dumanis campaign checks.

Azano also used his personal accounting secretary, and Symbolic Motors owner Marc Chase, to recruit straw donors. Chase ultimately delivered numerous $500 contributions from his family and Symbolic Motors employees who were reimbursed with

Azano's cash.  In total, Azano accounted for at least $15,000 of individual straw donor contributions to the Dumanis campaign in December 2011 and January 2012.

Azano, however, never submitted a campaign donation to the Dumanis campaign in his own name.  His wife donated.  His son Hester donated.  His secretary, accountant, and bodyguard all donated.  But Azano himself did not.

### 2. Airsam PAC—Azano's Shell Corporation Funds Independent Expenditure Committee to Support Dumanis Campaign

The straw donor effort proved too demanding for too little.  As a result, Azano instigated the formation of an Independent Expenditure Committee, or IE (known also as a "PAC" or "SuperPAC" on the federal level), to support Dumanis's primary campaign. Azano used a U.S.-based shell corporation, Airsam N492RM, LLC, to inject $100,000 into the IE, which represented 85% of the IE's funding.

While considering the formation of the IE, Encinas spoke with a San Diego political expert.  Encinas told the expert that a "billionaire" would be sponsoring the effort.  The expert had a conversation with Encinas, explaining that only lawful permanent residents could donate.  Encinas assured him that he was.  Shortly thereafter, the expert received a check from Airsam—not from the billionaire himself.

The sheer size of the $100,000 contribution raised eyebrows. The *San Diego CityBeat* published an article on May 23, 2012, "New Dumanis Super PAC backed by Mexican businessman," which quickly traced the money back to Airsam's owner: Azano.

### 3. Marc Chase Conduit Contributions to a Pro-Filner PAC and to Political Party Committees to Support Filner and Vargas

In the wake of that unwanted press, Azano and his conspirators engineered different means to camouflage his illegal campaign contributions.

In June 2012, Republican Bonnie Dumanis had lost in the primary of the campaign. So Azano and his conspirators had to find another candidate to back.  On August 17, 2012, Azano hosted mayoral candidate and Democrat Bob Filner at his home for a lunch meeting.  Co-conspirators Marco Polo Cortes and Ernie Encinas attended as well.  That meeting ended with Azano convinced Filner would support his "Miami West" vision for a

major redevelopment project of the bayfront area.  In fact, five days after this meeting, Marco Polo Cortes sent Azano an email entitled, "Chula Vista Bayfront Info," referencing the meeting with Filner and providing information on the area for development, calling it the largest open coastal space in the western United States.

Given the obstacles previously encountered, Azano and his co-conspirators pivoted to yet other illegal campaign contribution methods.   For example, three days after the meeting with Filner, Cortes received a form from the San Diego County Democratic Party, which included the warning that foreign national contributions were prohibited. Cortes forwarded this to Encinas, with the comment, "Call me to discuss. . ."  The next day, Cortes received an email from a Democratic Party fundraiser that set forth the foreign national prohibition, included a link to the FEC's description of the foreign national rules. The fundraiser explicitly requested proof of Azano's green card, in anticipation of his forthcoming contributions, as they had previously discussed.  Cortes forwarded the email to Encinas, with the message "FYI."   Cortes had earlier received an email from the Democratic Congressional Campaign Committee (DCCC), because of Azano's desire to support the Congressional campaign for Representative Juan Vargas.  That email likewise included a contribution form that required the contributor to affirm that he was a "U.S. citizen or lawful permanent resident."  Cortes had forwarded that, too, to Encinas, urging to Encinas: "Let's talk about this again."

Soon afterwards, Azano met with Marc Chase and Encinas in his kitchen.  There, the plan evolved, now aimed at funneling $180,000 of Azano's money into campaigns through Marc Chase and his business accounts.  Azano told Chase that he would provide him $180,000 and that Chase should then convert that money into checks from Chase or his companies.

In an email in the next few days, Chase requested "wiring instructions" regarding the "Rolls Royce"—a code word used to remind Azano about reimbursing him for these illegal transactions.   When Azano failed to understand the veiled meaning of "Rolls Royce," Chase responded by asking Azano if he "remember[ed] the conversation with

Ernie in your kitchen?"  Thereafter, Chase cut the checks as directed—three checks, for $120,000, $30,000 and $30,000—and gave them to Encinas.  Within the week, Azano provided Chase the money.  Co-defendant Cortes then personally delivered Chase's $120,000 check to the pro-Filner PAC.

### 4.    "In-Kind" Donations—Azano's Mexican Company Funds Singh's Unreported Work for the Dumanis and Filner Campaigns

In addition to money donations, Azano illegally funded "in kind" donations to the mayoral campaigns for both Dumanis and Filner.

#### (a)    *Dumanis In-Kind Contributions*

On Christmas Day 2011, Azano had a conference call with Dumanis, Encinas, and Singh, in order to suggest Singh for significant social media work for her campaign. Singh spoke with Dumanis's political consultant, Jennifer Tierney.  Tierney rejected multiple proposals requesting $495 to $1200 per month for Singh's services.  Azano ultimately promised to fund Singh's social media work himself, and Singh told the Dumanis campaign that he would work as a "volunteer."

Although ElectionMall emailed Azano directly about the bills, ElectionMall through "eSolutions" invoiced Azano's Mexico-based company Broadlink.  For their work on the Dumanis campaign—alternately called the "Betty Boo" or "Betty Boob" project—ElectionMall first invoiced Azano for $75,000 and later for additional amounts. In response to the updated invoices, Azano emailed, "No more money that wasn't the agmt with Ravi we will only transfer what I told him."  Azano ultimately used the Mexico-based Broadlink to wire $175,000 to eSolutions.  When emailing about the invoices, Singh wrote to Encinas "I am not responding to this email.  Because of the legal ramifications.  Please talk to me . . . in person."

#### (b)    *Filner In-Kind Contributions*

In mid-October 2012, as Azano's allegiances pivoted, Singh moved his team into Filner's campaign offices to handle the social media work.  He explained to the campaign manager that this had all been cleared by Filner, and when the campaign manager asked and re-asked how much it would cost, Singh replied that it was "taken care of."  By

Election Day, Azano's Mexico-based Broadlink company had paid ElectionMall (through eSolutions) over $190,000 for its work on the Filner campaign. Despite the significant revenue generated by these projects, members of ElectionMall's Board of Directors never heard about the Dumanis or Filner campaigns.

Within weeks of Filner's election as mayor, Azano met in London with a Middle East-based developer to continue developing his "Miami West" vision. A month after the election, Azano invited that developer and his partner to fly halfway around the globe to meet with him and Mayor Filner about the waterfront project. Four days after Filner's inauguration, that meeting took place at Azano's home. In addition to the London and San Diego meetings, Azano met the developers all over the world to discuss this project, including Las Vegas, Miami, and Brazil.

## C.   SINGH'S BRIBERY

In late 2013, Ernie Encinas recorded several conversations with Singh regarding an unreported "in kind" contribution scheme with a fictional "Mr. B," which was supposed to mimic what Singh had done for Azano. During the course of these conversations, Singh asked Encinas whether he could obtain information on a business rival. Encinas said that he had a DEA contact who could obtain classified information unavailable to the public, at a cost of $1,000. Ultimately, Singh agreed to pay this $1,000 bribe and flew to San Diego in January 2014 both to obtain the classified documents and to meet "Mr. B." On January 16, 2014, Singh and Encinas met with an undercover FBI agent, posing as the corrupt DEA official. Singh provided the cash to Encinas, who gave it to the agent, who in turn provided a phony dossier on the business rival. The FBI later arrested Singh, who said, "I plead guilty on that. . . . but it is not my intention to do anything wrong." At one point, Singh fantastically claimed that he was not buying information on the business rival for himself, but obtaining it so he could share the information with authorities (presumably, not the same authorities he had just bought the information from).

14-cr-388-MMA

D.    **AZANO'S FIREARM POSSESSION**

When agents executed a search warrant at Azano's Coronado Cays home, Azano told them that he had a gun in an unlocked gun case in his master bedroom closet. Agents in fact found a black Sig Sauer P225 with a laser sight and a fully loaded magazine in the gun case in Azano's master bedroom closet. Two associates stated that Azano told them after his arrest that the gun had been given to him as a gift by Mexican generals or the Mexican President.

**III**

**LAW**

A.    **CONSPIRACY, COUNTS 1 & 2**

The United States must prove each of the following elements beyond a reasonable doubt:

First, beginning on a date unknown, and continuing up through September 2013, there was an agreement between two or more persons to commit at least one crime as charged in the Third Superseding Indictment;

Second, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

Third, one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

A conspiracy is a kind of criminal partnership—an agreement of two or more persons to commit one or more crimes. The crime of conspiracy is the agreement to do something unlawful; it does not matter whether the crime agreed upon was committed.

For a conspiracy to have existed, it is not necessary that the conspirators made a formal agreement or that they agreed on every detail of the conspiracy. It is not enough, however, that they simply met, discussed matters of common interest, acted in similar ways, or perhaps helped one another. You must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy with all of you agreeing as to the particular crime which the conspirators agreed to commit.

One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy. Furthermore, one who willfully joins an existing conspiracy is as responsible for it as the originators. On the other hand, one who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator. Similarly, a person does not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists.

An overt act does not itself have to be unlawful. A lawful act may be an element of a conspiracy if it was done for the purpose of carrying out the conspiracy. The government is not required to prove that the defendant personally did one of the overt acts.

Ninth Circuit Model Criminal Jury Instructions 8.20 – Conspiracy-Elements (2010 ed.)

**B.    CONTRIBUTION OR DONATION BY A FOREIGN NATIONAL, COUNT 3**

The United States must prove each of the following elements beyond a reasonable doubt:

First, Jose Susumo Azano Matsura is a foreign national;

Second, Jose Susumo Azano Matsura made, directly or indirectly,

a.    a contribution or donation of money or other thing of value, or an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election; or

b.    a contribution or donation to a committee of a political party[5];

Third, the contributions and donations aggregated $25,000 or more during calendar year 2012; and

Fourth, Defendant acted knowingly and willfully.

---

[5]    Although the statute also covers expenditures and independent expenditures, those are defined to include only payments in connection with federal elections, and are not relevant here.

14-cr-388-MMA

The term "foreign national" means an individual who is not a citizen of the United States and who is not lawfully admitted for permanent residence.  Although the statute defines "foreign national" as an individual who is not a "citizen of the United States" or a "a national of the United States (as defined in section 1101 (a)(22) of title 8) and who is not lawfully admitted for permanent residence" the Ninth Circuit has defined "national of the United States" to mean a natural born, or naturalized United States citizen.  *Perdomo-Padilla v. Ashcroft*, 333 F.3d 964, 965 (9th Cir. 2003) (a person may become a "national of the United States" only through birth or naturalization).  Given the redundancy, the instruction should define foreign national simply as a person who is not a United States citizen and who is not a lawful permanent resident.

The term "contribution" includes any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office; or the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose.  The term "contribution" does not include the value of services provided without compensation by any individual who volunteers on behalf of a candidate or political committee.[6]  2 U.S.C. § 431.  It is a term of associated only with "influencing any election for Federal office."  *Id.*  The term "donation" covers like conduct, made in connection with a state or local election.

Section 437g criminalizes contributions or donations by a foreign national, if the contribution or donation is made knowingly and willfully.  An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident.

Willfully as used in § 437g tracks the Supreme Court's formulation in *Bryan v. United States*, 524 U.S. 184, 193 (1998) ("The jury must find that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful.") (emphasis added).  It does not require proof that a defendant knew that

---

[6]   There are additional exclusions from the definition of contribution, but they will not be relevant at trial.  None of the alleged acts could be described to come within the scope of those exclusions.  See generally 2 U.S.C. § 431.

his conduct violated a specific law.  See, e.g., *Ratzlaf v. United States*, 510 U.S. 135 (1994).    Indeed, every court to address § 437g has so concluded.  *United States v. Whittemore*, 944 F. Supp. 2d 1003, 1010 (D. Nev. 2013), aff'd, 776 F.3d 1074 (9th Cir. 2015) ("[T]he government must prove that Whittemore knew his conduct violated some law, but it need not prove which one[.]"); *United States v. Whittemore*, 776 F.3d 1074, 1080-81 (9th Cir. 2015) ("The court also instructed the jury that the defendant must have acted 'knowingly and willfully,' meaning that 'the defendant is aware of the act and does not act through ignorance, mistake, or accident,' and that 'the defendant acted with knowledge that  some part of his course of conduct was unlawful and with the intent to do something the law forbids.'    Based on these instructions, the jury was permitted to conclude that Whittemore acted without the requisite intent by giving funds to his donees without the purpose that these funds be used for improper campaign contributions."); *United States v. Trie*, 21 F. Supp. 2d 7, 16 (D.D.C. 1998) ("Congress expressly stated that the 'knowing and willful' requirement was intended to limit liability to cases in which 'the acts were committed with a knowledge of all the relevant facts and a recognition that the action is prohibited by law.' H.R.Rep. No. 94–917, at 4 (1976)."); *United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999) ("But this extends *Ratzlaf* too far: that case did not universalize a broad reading of 'willfully' and thus overturn the general rule that ignorance of the law is no excuse.. . . .We find *Ratzlaf*'s narrow exception inapplicable and adopt the natural reading of mens rea above."); *United States v. Danielczyk*, 788 F. Supp. 2d 472, 491 (E.D. Va.), opinion clarified on denial of reconsideration, 791 F. Supp. 2d 513 (E.D. Va. 2011), rev'd, 683 F.3d 611 (4th Cir. 2012), and rev'd in part on other grounds, 683 F.3d 611 (4th Cir. 2012) ("Thus, for Counts Two and Three, the Government must prove that Defendants intended to violate the law (whatever the law was); but it need not prove Defendants' awareness of the specific law's commands"). Under *Bryan*, an act is done willfully if the defendant acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids, and again not by mistake or accident.  In other words, a person acts "willfully"

when he acts with a bad purpose to disobey or disregard the law.  It is not necessary for the government to prove that the defendant was aware of the specific provision of the law that he is charged with violating.  Rather, it is sufficient for the defendant to act knowing that his conduct is unlawful, even if he does not know precisely which law or regulation makes it so.

## C.   CONTRIBUTION IN THE NAME OF ANOTHER, COUNT 4

In order for a defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, the defendant made a contribution in the name of another person, aggregating $25,000 or more during calendar year 2012;

Second, the person named as the contributor was not the true source of the money used for the contribution, and the defendant was aware of this; and

Third, the defendant acted knowingly and willfully.

The terms "contribution" and "knowingly" and "willfully" are defined the same as Count 3.

For the purposes of this statute, both the donor and his intermediary "make" the contribution, and thus both can incur criminal liability.  *United States v. O'Donnell*, 608 F.3d 546, 550 (9th Cir. 2010).  It "encompasses straw donor contributions, whether accomplished through the advancement or reimbursement of funds." *Id.*

## D.   FALSIFICATION OF RECORDS, COUNTS 5-37

In order for a defendant to be found guilty of this charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly concealed, covered up, falsified, and made a false entry in a record or document; and

Second, the defendant acted with the intent to impede, obstruct or influence an actual or contemplated investigation of a matter within the jurisdiction of the Federal Bureau of Investigation.

14-cr-388-MMA

An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake, or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful. You may consider evidence of the defendant's words, acts, or omissions, along with all the other evidence, in deciding whether the defendant acted knowingly.

A defendant does not have to personally conceal, cover up, falsify or make a false entry in a record or document.  To prove a defendant guilty of falsification of records related to campaign finance, by causing the falsification of records, the government must prove beyond a reasonable doubt that a defendant willfully caused an act to be done which if directly performed by him or another would constitute the crime of falsification of records related to campaign finance.

[Ninth Circuit Model Criminal Jury Instructions 8.131A, 5.6—Falsification of Records, Knowingly (2010 ed.); 18 U.S.C. § 2(b)]

Section 1519 was drafted to eliminate the technical requirements found in some other obstruction statutes.  "By the plain terms of § 1519, knowledge of a pending federal investigation or proceeding is not an element of the obstruction crime."  *United States v. Gray*, 642 F.3d 371, 377 (2d Cir. 2011); *United States v. Moyer*, 674 F.3d 192, 206 (3d Cir. 2012)  ("[T]he statute does not require the existence of a federal investigation before criminal liability may attach, [and] it certainly does not require the federal government to identify a specific federal statute that is the focus of the investigation."); *United States v. Ionia Mgmt. S.A.*, 526 F. Supp. 2d 319, 329 (D. Conn. 2007) ("In comparison to other obstruction statutes, § 1519 by its terms does not require the defendant to be aware of a federal proceeding, or even that a proceeding be pending."). As a result, Section 1519 does not implicate the "nexus" issues that bedevil other obstruction statutes, such as Section 1503 and Section 1512.  *Gray*, 642 F.3d at 377 ("In enacting § 1519, Congress rejected any requirement that the government prove a link between a defendant's conduct and an imminent or pending official proceeding.").

14-cr-388-MMA

E.      **BRIBERY OF A PUBLIC OFFICIAL, COUNT 38**

Defendant Ravneet Singh is charged in Count 38 of the Third Superseding Indictment with bribing a public official in violation of Section 201(b)(1) of Title 18 of the United States Code.  In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, the defendant gave, offered, or promised something of value to Federal Bureau of Investigations Special Agent Omer Meisel, posing as an agent with the Drug Enforcement Administration; and

Second, the defendant acted corruptly, that is, with the intent to influence an official act or induce the Special Agent Meisel to do or to omit to do an act in violation of his lawful duty.

Ninth Circuit Model Criminal Jury Instructions 8.12—Bribery of a Public Official (2010 ed.).

F.      **ALIEN IN POSSESSION OF A FIREARM, COUNT 39**

Defendant Jose Susumo Azano Matsura is charged in Count 39 of the Third Superseding Indictment with possession of a firearm in violation of Section 922(g) of Title 18 of the United States Code.  In order for the defendant to be found guilty of that charge, the United States must prove each of the following elements beyond a reasonable doubt:

First, the defendant knowingly possessed a firearm;

Second, the firearm had been shipped from one state to another; and

Third, at the time the defendant possessed the firearm, the defendant was admitted to the United States under a nonimmigrant visa.

To establish "knowingly" under the first element, the government need not prove the defendant's knowledge of the law, only that the defendant consciously possessed what he knew to be a firearm.

The phrase "nonimmigrant visa" means a visa properly issued to an alien as an eligible nonimmigrant.

14-cr-388-MMA

Ninth Circuit Model Criminal Jury Instructions 8.63, 8.65—Unlawful Possession of Firearm (2010 ed.).

### 1.    Section 922(y) Sets Forth Affirmative Defenses, Not Elements of the Offense

Section 922(y) provides exceptions from the prohibition under 18 U.S.C. § 922(g)(5)(B) of possession of firearms for certain aliens admitted on non-immigrant visas.  Those exceptions are affirmative defenses, not elements that the United States is required to prove.  Although no court has examined the exceptions contained in 922(y), courts have uniformly concluded that exceptions contained in other subsections of § 922 are affirmative defenses.  That follows "the longstanding principle that 'an indictment or other pleading founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause . . . . [I]t is incumbent on one who relies on such an exception to set it up and establish it." *McKelvey v. United States*, 260 U.S. 353, 35 (1922).

In *United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997), the Ninth Circuit examined the exceptions contained in § 922(o) and concluded that

> We agree with the Eighth Circuit that, rather than setting forth additional elements of the offense that the government must prove, "[t]he exceptions contained in part (2) of the subsection establish affirmative defenses to the defined offense." *United States v. Just*, 74 F.3d 902, 904 (8th Cir.1996). This interpretation is consistent with the Supreme Court's settled rule that "an indictment . . . founded on a general provision defining the elements of an offense . . . need not negative the matter of an exception made by a proviso or other distinct clause." *McKelvey v. United States*, 260 U.S. 353, 357, 43 S.Ct. 132, 134, 67 L.Ed. 301 (1922). This reading of the statute is also consistent with this circuit's "well-established rule . . . that a defendant who relies upon an exception to a statute . . . has the burden of establishing and showing that he comes within the exception." *United States v. Freter*, 31 F.3d 783, 788 (9th Cir.1994)(internal quotation omitted). Where, as in this case, the "statutory prohibition is broad and an exception is narrow, it is more probable that the exception is an affirmative defense."

1    *Gravenmeir*, 121 F.3d at 528.  The same is true of section 922(g)(5)(B) and 922(y):  the

2    prohibition is broad and the exceptions are narrow.  *See also United States v. Greenberg*,

3    596 F. App'x 550, 552 (9th Cir. 2015) ("Finally, Greenberg argues that the district court

4    omitted an essential part of the jury instructions for count 74, a violation of 18 U.S.C.

5    § 922(o), unlawful transfer or possession of a machine gun. Greenberg contends that the

6    instructions should have indicated that the statute does not apply if the possession was

7    lawful. We have already held that this instruction for lawful possession is an affirmative

8    defense."); *United States v. Zuniga*, 767 F.3d 712, 719 (7th Cir. 2014), *cert. denied*, 135

9    S. Ct. 1018 (2015) ("We have stated previously that, "the civil rights restoration exception

10   in section 921(a)(20) is not an element of the offense described in section 922(g)," but

11   rather "is an affirmative defense to a criminal charge under 18 U.S.C. § 922(g)(1)."); 

12   *United States v. Lawrence*, 349 F.3d 109 (3d Cir. 2003) (the "antique firearm" exception

13   is an affirmative defense"); *Gil v. Holder*, 651 F.3d 1000, 1005 n.3 (9th Cir. 2011)

14   ("Consistent with this holding, every other circuit of which we are aware that has

15   considered the § 921(a)(3) "antique firearm" exception in the criminal context, has treated

16   it as an affirmative defense rather than an element of the crime."); *United States v. Harris*,

17   627 F. App'x 379, 380 (5th Cir. 2015) ("Although this court has not addressed the issue,

18   every circuit to consider the question has held that the antique weapons exception is "an

19   affirmative defense that must initially be raised by sufficient evidence to justify shifting a

20   burden of proof to the government."); *United States v. Royal*, 731 F.3d 333, 338 (4th Cir.

21   2013) ("[S]ince § 921(a)(3) clearly sets apart the antique firearm exception as a distinct

22   proviso to the general definition of 'firearm,' courts have not hesitated to place the burden

23   on defendants to raise it as an affirmative defense.").  The United States therefore does not

24   have the burden to prove that the exceptions are not applicable here.[7]

25

26   [7]     The indictment alleges that Azano did not meet two of those exceptions.  That is
surplusage that does not have to be proved.  *United States v. Jenkins*, 785 F.2d 1387, 1392

27   (9th Cir. 1986) ("The cases make clear that the government need not prove all facts
charged in an indictment; instead, only enough facts to prove the essential elements of the

28   crime must be demonstrated at trial.  Insofar as the language of an indictment goes beyond
alleging elements of the crime, it is mere surplusage that need not be proved.").

## G.   CERTIFIED BUSINESS RECORDS ARE ADMISSIBLE

The United States moves to admit business records pursuant to Fed. R. Evid. 803(6) and 902(11).  As part of its discovery production, the United States has provided, or made available for inspection, copies of the Fed. R. Evid. 902(11) declarations obtained from the records custodians or other qualified witnesses from the businesses that supplied the documents.   The United States will file a list of the business records (and/or public records) we intend to admit under separate cover as **Appendix C**.

In the absence of stipulations, the United States requests that the Court admit the business records without foundation testimony from the records custodians or similar witnesses as long as the records are authenticated in accordance with Fed. R. Evid. 902(11).   Under Rule 902(11), "a party may authenticate a business record through a written declaration by a qualified custodian that the record meets the necessary foundational requirements," but the party intending to offer the record must "provide written notice of that intention to all adverse parties, and . . . make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them."   Fed. R. Evid. 902(11).   To satisfy Rule 902(11), the declaration must be signed by a custodian of the domestic records or "other qualified person"[8] certifying that the record: (1) "was made at or near the time by—or from information transmitted by—someone with knowledge;" (2) "was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;" and (3) "making the record was a regular practice of that activity."  Fed. R. Evid. 803(6) & 902(11).

---

[8]    The term "other qualified person" should be "broadly interpreted to require only that the witness understand the record-keeping system."   *United States v. Ray*, 930 F.2d 1368, 1370 (9th Cir. 1990); *see also United States v. Leal*, 509 F.2d 122, 127 (9th Cir. 1975) (concluding that the witness need not be the person who made the business record, but merely "someone who is sufficiently familiar with the practices of the business involved").

It is well-established that introducing business records with a sworn declaration of a custodian of records does not violate the Confrontation Clause.  *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009) (Business records "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial . . . are not testimonial" and may be admitted absent confrontation); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (holding that "a routine certification by a custodian of a domestic public record . . . and a routine attestation to authority and signature . . . are not testimonial in nature" for purposes of *Crawford*); *United States v. Johnson*, 297 F.3d 845, 864 (9th Cir. 2002) ("Because, to the extent they contained any hearsay, the sales orders, tapes, and bank records fell within the business records exception, none of these pieces of evidence violated the Confrontation Clause."); *see also United States v. Adefehinti,* 510 F.3d 319, 327-28 (D.C. Cir. 2007) (rejecting Confrontation Clause challenge to admission of loan documents); *United States v. Park*, D.C. No. 2:09-cr-00128-VBF-1, 2013 WL 4008153, * 1 (9th Cir. August 7, 2013) (unpublished) (rejecting Confrontation Clause challenge to admission of bank loan applications in wire and bank fraud trial); *United States v. Lovellette*, 472 Fed. Appx. 593, 594-95, 2012 WL 1023004 (9th Cir. 2012) (unpublished) (rejecting Confrontation Clause challenge to admission of business and public records in a trial for theft from a credit union employee and tax evasion).

The notice requirement in the rule is "intended to give the opponent of the evidence a full opportunity to test the adequacy of the foundation set forth in the declaration."  Fed. R. Evid. 902(11), Advisory Committee's Note to the 2000 amendments.  "In other words, the burden is put on the opponent of the evidence, given enough time to do so, to show that the foundation provided by the affiant or declarant is so weak as to fail to meet the minimal standards of authenticity established by Article 9 of the Federal Rules." *DirectTV, Inc. v. Murray*, 307 F. Supp. 2d 764, 773 n.4 (D. S.C. 2004).  A party who receives notice under Rule 902(11) and fails to object to the introduction of the records prior to trial may waive the right to object to the introduction of the records into evidence

1 at trial.  *See, e.g., United States v. Bledsoe*, 2004 WL 21490952, *3 (7th Cir. 2003)
2 (unpublished) (Since the prosecution informed defendant that it intended to introduce
3 business records with a written declaration four days before trial, defendant was provided
4 "sufficient time to determine whether an objection was needed to be made or more time
5 was needed for an adequate review.").

6 **H.  CERTIFIED PUBLIC RECORDS**

7 The United States also will seek to admit copies of San Diego City Clerk's Office
8 records, records maintained by the Federal Election Commission, records maintained by
9 the San Diego Ethics Commission, the Department of Homeland Security and the
10 Department of State.  These are admissible either as certified business records pursuant to
11 Fed. R. Evid. 803(6) and its corollary 902(11), or as certified public records pursuant to
12 803(8) and 902(4).  *See, e.g.*, *United States v. Loyola-Dominguez*, 125 F.3d 1315 (9th Cir.
13 1997) (admitting A-file documents as public records over hearsay objection); *United*
14 *States v. Rojas-Pedroza*, 716 F.3d 1253, 1267 (9th Cir. 2013) (admitting A-file documents
15 over confrontation clause challenge).

16 Federal Rule of Evidence 803(6) provides that records of "a regularly conducted
17 activity" may be admissible if (1) "the record was made at or near the time by—or from
18 information transmitted by—someone with knowledge"; (2) "the record was kept in the
19 course of a regularly conducted activity of a business, organization, occupation, or calling,
20 whether or not for profit"; (3) "making the record was a regular practice of that activity";
21 (4) the testimony of a custodian, another qualified witness, or where applicable a
22 certification shows the above conditions are satisfied; and (5) "neither the source of
23 information nor the method or circumstances of preparation indicate a lack of
24 trustworthiness." Fed.R.Evid.  803(6)(A)-(E).   In addition, to authenticate an item of
25 evidence under Rule 901, the "proponent must produce evidence sufficient to support a
26 finding that the item is what the proponent claims it is." Fed.R.Evid. 901(a). The
27 proponent may do so through such methods as the "testimony of a witness with
28 knowledge." Fed.R.Evid. 901(b)(1).

Federal Rule 803(8) provides that public records may be admissible from a public office if the record "sets out: (i) the office's activities; [or] (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel."   Thus, records collected or generated during the routine government function are admissible.

# I.   STATEMENTS FROM THE DEFENDANTS' AGENTS OR EMPLOYEES ARE ADMISSIBLE

Federal Rule of Evidence 801(d)(2)(C) provides that a statement is a non-hearsay party admission if it "is offered against a party and is . . . a statement by a person authorized by the[defendant] to make a statement concerning the subject." Rule 801(d)(2)(D) provides that a statement is not hearsay if it "is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Subsection (C) thus requires the declarant to have specific authority from a party to make a statement concerning a particular subject. Subsection (D) authorizes admission of any statement against a party, but only provided it is made within the scope of an employment or agency relationship.

To determine whether statements are admissible under Rule 801(d)(2)(D), the court must "undertake a fact-based inquiry applying common law principles of agency." *NLRB v. Friendly Cab Co., Inc.*, 512 F.3d 1090, 1096 (9th Cir.2008).

Statements of employees are admissible; statements of independent contractors are not necessarily so.  Determining whether a speaker is an "employee" or an "independent contractor" requires a fact-based inquiry applying common law principles of agency. *N.L.R.B. v. United Ins. Co. of Am.*, 390 U.S. 254, 256 (1968) (stating that "there is no doubt that we should apply the common[ ]law agency test ... in distinguishing an employee from an independent contractor"). The Second Restatement of Agency sets forth ten factors that a court should consider: 1) the control exerted by the employer, 2) whether the one employed is engaged in a distinct occupation, 3) whether the work is normally done under the supervision of an employer, 4) the skill required, 5) whether the employer

supplies tools and instrumentalities, 6) the length of time employed, 7) whether payment is by time or by the job, 8) whether the work is in the regular business of the employer, 9) the subjective intent of the parties, and 10) whether the employer is or is not in business. *Restatement (Second) Agency* § 220(2) (1958); *Restatement (Third) Agency § 1.01 cmt. c.*

"Although courts must look to the totality of the circumstances, "[t]he essential ingredient of the agency test is the extent of control exercised by the 'employer.' It rests primarily upon the amount of supervision that the putative employer has a right to exercise over the individual, particularly regarding the details of the work." *Sida of Hawaii, Inc. v. N.L.R.B.*, 512 F.2d 354, 357 (9th Cir. 1975) (internal quotation marks and citation omitted). Additional factors that are relevant to this determination include "entrepreneurial aspects of the individual's business; risk of loss and opportunity for profit; and the individual's proprietary interest in his business." See *Merchants*, 580 F.2d at 973; *SIDA*, 512 F.2d at 359. Courts assess and weigh all of the incidents of the relationship with the understanding that no one factor is decisive, see *United Ins.*, 390 U.S. at 258, 88 S.Ct. 988, and that "[i]t is the rare case where the various factors will point with unanimity in one direction or the other." *Merchants*, 580 F.2d at 973. *N.L.R.B. v. Friendly Cab Co.*, 512 F.3d 1090, 1096-97 (9th Cir. 2008).

The United States will be introducing statements made by agents of Azano and defendant ElectionMall.  For example, the United States anticipates that testimony will be elicited about statements made by Elizabeth Lugo (a secretary for Azano); Anthony Bufinsky (Executive Vice President for Beverly Hills Financial); Ernie Encinas (employee and co-conspirator); Jason Wolter (employee of Azano); Abel Garcia (accountant for Azano); and Aaron Ronsheim; Miguel de la Vega; Jennifer Fulton-Ratke; Megan Standefer; Maria Aguilar; Savina Singh; and Simerneet Singh (ElectionMall employees).

14-cr-388-MMA

## IV

### WITNESSES

The United States expects to call in its case-in-chief some or all of the witnesses in the witness list, which is attached as **Appendix A** to this Trial Memorandum.  We reserve the right to add or omit witnesses.

## V

### EXHIBIT LIST

The United States will file under separate cover a proposed exhibit list as **Appendix B**.

## VII

### JURY INSTRUCTIONS

The United States will file proposed jury instructions and a proposed verdict form under separate cover.

DATED: July 20, 2016

Respectfully submitted,

BLAIR C. PEREZ
Attorney for the United States
Acting Under 28 U.S.C. § 515


/s/ *Helen H. Hong*
ANDREW G. SCHOPLER
MARK W. PLETCHER
HELEN H. HONG
Assistant U.S. Attorneys

14-cr-388-MMA

# APPENDIX A

## UNITED STATES' DRAFT WITNESS LIST

| 1. | Aguilar, Maria |
|---|---|
| 2. | Ahumada, Richard |
| 3. | Austensen, Lauritz (Dept. of State) |
| 4. | Beals, Matthew |
| 5. | Bowman-Fleurov, Samantha |
| 6. | Bufinsky, Anthony |
| 7. | Chase, Marc |
| 8. | Clancy, Ed |
| 9. | Crummit, Gary |
| 10. | DeMaio, Carl |
| 11. | Dierker, Hayley |
| 12. | Duarte, Brian |
| 13. | Duque, Angela |
| 14. | Duque, Diego |
| 15. | Durazo, Itzel |
| 16. | Encinas, Ernesto |
| 17. | Falcone, Olivia |
| 18. | Flores, Concepcion (Dept. of Homeland Security) |
| 19. | Fulhorst, Stacey |
| 20. | Fulton-Ratke, Jennifer |
| 21. | Garcia, Jose |
| 22. | Garcia-Davila, Abel |
| 23. | Godinez, Ramon |
| 24. | Gore, Bill |
| 25. | Grochowiak, Erik |
| 26. | Grossman, Elliot |
| 27. | Guillory, Matthew |
| 28. | Hart, Betty |
| 29. | Hickey, Robert |
| 30. | Hughes, Sean |
| 31. | Kasmer, Marcel |
| 32. | Kiszonak, Jason |
| 33. | Klein, Kevin |
| 34. | Krent, Hal |
| 35. | Marchioni, Brent |
| 36. | Marshall, Marla |
| 37. | Maruccia, Kelli |

| 38. | Meisel, Omer |
|-----|--------------|
| 39. | Mikelatos, Phil |
| 40. | Nehring, Ron |
| 41. | Nicholas, Frank |
| 42. | Noon, William |
| 43. | Pedace, Michael |
| 44. | Peterson, Christopher |
| 45. | Rich, Aaron (FBI) |
| 46. | Ronsheim, Aaron |
| 47. | Shepard, Tom |
| 48. | Spillane, Kevin |
| 49. | Spix, George |
| 50. | Stacey, Michael |
| 51. | Standefer, Meghan |
| 52. | Tierney, Jennifer |
| 53. | Torres, Gil |
| 54. | Wachob, Bill |
| 55. | Wainio, John |
| 56. | Walsh, Tim |
| 57. | Warren, Nancy |
| 58. | Wolter, Jason |
| 59. | Yousif, Kusay |
| 60. | Yousif, Sulaik |
| 61. | Zarate, Luisa |

14-cr-388-MMA

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Case No. 14-cr-388-MMA |
| v. | CERTIFICATE OF SERVICE |
| JOSE SUSUMO AZANO MATSURA (1),<br>    aka Mr. A.,<br>    aka Mr. Lambo,<br>RAVNEET SINGH (2),<br>    aka Ravi Singh,<br>MARCO POLO CORTES (4),<br>EDWARD SUSUMO AZANO HESTER (5),<br>    aka Susu,<br>    aka Junior, | |
| Defendants. | |

I, the undersigned, declare under penalty of perjury that I served the foregoing document on the above-captioned party(ies) by:

- ■ electronically filing it with the U.S. District Court for the Southern District of California using its ECF System, which electronically notifies the party(ies).

- ☐ causing the foregoing to be mailed by first class mail to the parties identified with the District Court Clerk on the ECF System.

- ☐ causing the foregoing to be mailed by first class mail to the following non-ECF participant in this case at the last known address, at which place there is delivery service of mail from the United States Postal Service:

Executed on July 20, 2016.

/s/ *Helen H. Hong*
ANDREW G. SCHOPLER
MARK W. PLETCHER
HELEN H. HONG
Assistant United States Attorney